## Case No. 5,496.

### GODDEFROY v. The LIVE YANKEE.

[Hoff. Op. 433.]

District Court, N. D. California. Feb. 18, 1857.

GENERAL AVERAGE—CONTRIBUTION—JETTISON OF DECK LOAD.

[1. Where the master, by the notorious and established usage of a particular trade, has the right to carry a part of his cargo on deck without obtaining the consent of the shipper, contribution will be allowed for a loss by jettison.]

[2. If such usage only authorizes the stowage of certain kinds of goods on deck, then, to make the other shippers liable, it must appear that such goods form a usual and customary part of the cargo of vessels in the trade.]

[3. Where goods are carried on deck by special agreement with the owner, and at a lower rate of freight, he cannot have contribution for a loss by jettison, though the practice of carrying deck loads is invariable in the trade.]

[4. Where a cargo of lumber is taken to be carried "on deck and under deck," at a uniform rate for the entire lot, with the understanding that part is to be laden on deck, the rate being less than if the load were all carried under deck, and it is the established usage to carry deck loads by express consent of owners, the shipper is not entitled to general average contribution for a jettison of the deck load.]

In admiralty.

J. P. Haven, for libellants.

Whitcomb, Pringle & Felton, for claimants.

HOFFMAN, District Judge. The libel in this case is filed to recover a general average contribution for goods jettisoned from the deck of the above vessel. It is admitted that the cargo, which consisted of lumber, belonged to the libellants [Goddefroy, Sillem & Co.], and that it was taken on board to be carried "on deck and under deck," at the rate of $8 per M. No difference as to the rate of freight was made between that part of the cargo carried on deck and that carried under deck, but the rate charged was agreed to, with the understanding that part of the cargo was to be laden on deck, and was undoubtedly less than would have been demanded if the shipper had insisted that all his goods should be stowed in the hold. It was clearly established by the proofs that vessels engaged in the lumber trade on this coast universally carry deck loads. Capt. Noyes, the dock master of this city, testifies that for the last four years he has seen lumber vessels arriving almost daily, and that nearly every one brings a deck load. Capt. Swazey and Capt. Cheever testify to the same effect, and E. E. Williams, the agent of the Mendocino Mills, from which the lumber in the case at bar was shipped, states that since 1851 there have been loaded at those mills at least 250 vessels, and that every one carried a deck load. Capt. Badger, a witness called by the claimants, testified that he had made about 100 voyages in the lumber trade, and that he always carried a deck load. It is unnecessary, however, to recapitulate the evidence, for I understand that the existence of a notorious and universal usage on the part of lumber vessels to carry deck loads is not denied. The only question of fact contributed at the trial was whether the presence of a deck load obstructs the navigation or affects the seaworthiness of the vessel. The evidence on this point will be considered hereafter.

The Consulate of the Sea, c. 141 (2 Pard. Lois Mar. p. 155), excludes from the benefit of general average goods stowed on deck with the consent of the owner. But if there

be no such consent the ship and the master are liable, and the claim of the shipper upon the former is preferred to all others, except that of seamen for their wages. The Ordonnance of the Marine contains a similar provision, and by article 12, tit. 1, liv. 2 ("Du Capitaine"), the master is forbidden to carry any goods on deck, without the consent of the merchant, on pain of being responsible for all damages. With regard to the first provision, denying contribution for goods laden on deck, the reasons assigned by Valin are that the goods can only be on deck because there is no room to stow them elsewhere, or by the negligence or fault of the master in not putting them elsewhere, and that it is no more permitted him to overload his ship than to expose goods to the risk of falling into the sea by their improper stowage. He adds that the reason why the article refuses payment by contribution for damage to goods so carried is that, as they cannot but embarrass the manoeuvring of the ship, the presumption is that they have been jettisoned before any necessity for a jettison has occurred, and solely because they hindered and embarrassed the navigation. But this article does not, he says, apply to vessels navigating "au petit cabotage," or going from port to port, where the usage is to load the goods on deck as well as under deck. 2 Valin, Comm. p. 203. With respect to article 12, which prohibits the master from carrying goods on deck without the consent of the shipper, Valin observes: "It is obvious that merchandise on deck runs too great risk in a long navigation, and even whenever the ship is obliged to put out to sea, and no longer sails along the coast." But he says this article does not apply to the navigation "au petit cabotage," where a usage to load perishable articles in boats without decks, or on deck in boats with decks, has always been tolerated, in consideration that otherwise freights would be higher. He then mentions a case in the Admiralty of Rochelle, in which one Rene Riquet, "in consideration of the notoriety of the usage," recovered a contribution from the ship, the freight and his coshippers, for a quantity of flour jettisoned from the deck of a vessel on a voyage "au petit cabotage."

The Code de Commerce, which re-enacts the provision of the Ordonnance prohibiting the master from carrying goods on deck without the written consent of the shipper, also adopts Valin's qualification, and the provisions of the article are declared not to extend to voyage "au petit cabotage." Article 421 of the Code is in the precise terms of article 13 of the Ordonnance, and the owner of the goods laden on deck is denied contribution for their loss by jettison, his only recourse being against the master. A question thus arose whether this provision was of universal application, and contribution for such goods could in no case be claimed or whether the exception as to "petit cabotage" in article 229 was not also to be understood as applying to article 421. Emerigon inclines to the opinion that the general terms of the latter article apply without qualification, and that no contribution can be demanded, and he cites an arret of the cours royale at Rennes, 24th January, 1822. Emer. tom. 1, p. 640. We have seen that Valin's opinion on the point, as it arose under the provisions of the Ordonnance is in favor of the claim, and Boulay-Paty, after citing Emerigon, examines the question, and agrees with Valin in opinion. 4 Boul.-P. Dr. Com. p. 567. But the question has been finally settled in French jurisprudence. By an arret of the court of cassation of May 20, 1845, cited in Rogron's edition of the Code de Commerce (page 761), it is decided that the owner of goods laden on deck on a voyage "au petit cabotage," who by article 229 has no recourse against the master, can, notwithstanding the general language of article 429, recover contribution against other shippers.

We have seen that the master is prohibited by law in France from carrying goods on deck, without the written consent of the owner, in all cases except on the voyages specified. It is, therefore, only in this excepted case that contribution can be claimed. It has accordingly been decided in France that where goods were carried on deck by the consent of the shipper, on a voyage not "au petit cabotage," neither the owner nor insurer has the right to demand contribution from the master. Arret of the court of Bordeaux, cited Rogron, Code de Comm. p. 506. This decision is in accordance with the provisions of the Consolato del Mare, which subjected the owner of goods, who consented to their being laden on deck, to the whole risk of that mode of stowage. Consol. del Mar. ubi supra. It is evident from what has been said that the general question, whether goods carried on deck according to a notorious and general usage of any trade, ought to be entitled to contribution, cannot arise in France, for the courts must apply the terms of the law to all cases not excepted, and the only excepted case is that of "petit cabotage." But the reasons of that exception, as suggested by Valin, and which led to its adoption in the Code de Commerce, are of general application, and the exception should, in our system, which is not fettered by statutory enactments, be extended to all cases which fall within its principle. Voyages "au petit cabotage" in France are defined by statute. They include voyages between French ports on the ocean, or from ports on the channel, to ports in England, Ireland, Scotland, and Holland, and from ports on the Mediterranean to ports as far as Naples on one side and Malaga on the other. Dictionaire de Comm. In these voyages, the conveniences, if not the necessity, of trade, require that goods should be tak-

en on deck—all parties are informed of the practice, and the shipper has no right to object that his goods are carried as allowed by law—nor can he know whether his goods will be on or under deck. As the other shippers participate in the reduction of freight, and as the ship has her capacity increased, it is but just that all should contribute for a sacrifice made for the common safety.

The general question has, however, been determined in England. In Gould v. Oliver, 4 Bing. N. C. 134, it was held that the owner of goods laden on deck, according to the custom of a particular trade, is entitled to contribution from the ship owner for a loss by jettison. It is to be remarked that this principle was asserted, notwithstanding a plea by the defendant that there was no custom that a contribution should be made for such a loss, which plea was demurred to. In Milward v. Hibbert, 3 Adol. & E. (N. S.) p. 120, it was held, in an action against underwriters to recover the amount contributed by the owner of the ship insured for a loss of deck cargo by jettison, that a plea that the cargo was laden on deck was bad. The mere fact that the goods were so laden was held not enough to relieve the underwriter from responsibility, "inasmuch as they may be placed there according to the usage of trade, and so as not to impede the navigation, or in any way increase the risk."

In America, several cases, which are cited in the respondents' briefs, have arisen. In some of them, however, the point under consideration did not arise, nor does the principle on which the decision is based seem to be uniform. In Lenox v. Marine Ins. Co., 1 Caines, 44, note, contribution was denied on the ground that goods on deck embarrass the navigation—and there was, accordingly, an implied agreement not to demand contribution. The same decision was made in Smith v. Wright, 1 Caines, 43, but in that case it appeared that the goods were shipped at lower freights, and the usage appeared to be against the claim. In Lenox v. United Ins. Co., 3 Johns. Cas. 178, it was held that the owners of cargo, under cover, ought not to contribute to the jettison of goods on deck, "as they are not considered part of the cargo in which other shippers are interested." In this case, there was no evidence of a usage to carry a deck load. In Dodge v. Bartol, 5 Greenl. 286, the claim was rejected, on the ground that the goods on deck were carried for half freight, and by the express permission and assent of the shipper. In Cram v. Aiken, 13 Me. 229, it was considered that by the commercial law goods shipped on deck are not entitled to the benefit of general average; that such was the law of France, except in regard to boats and small vessels; and that no opposing English decision had been adduced. The cases of Gould v. Oliver and Milward v. Hibbert, had not then been decided. The goods in this case paid full freight, and it appeared

to be the usage to carry that kind of goods on deck. The claim was rejected, however, on the ground that goods so laden are peculiarly exposed, and increase the danger of navigation. In Brown v. Cornwall, 1 Root, 60, it was held that stock on deck jettisoned for the common safety is entitled to an average loss.

The text writers have generally acquiesced in the recent English decisions as settling the law on the question. They are so treated by the editor of the last edition of Abbott on Shipping. Arnold (volume 2, Insurance, p. 890) says, "On proof of the usage they (i. e. goods on deck) are contributed for like other goods." Mr. Phillips maintains the same doctrine in a learned and elaborate opinion published in 3 Hunt, Mer. Mag. 432, and in the last edition of his work on Insurance (volume 2, p. 74) he says: "Taking into consideration the whole jurisprudence on the subject, the better doctrine, though opposed by some of the adjudications above cited, seems to be that a jettison of a deck load is to be contributed for in a general average, where the stowage of the jettisoned article on deck is justifiable, and the other parties have notice, by the policy or by usage or otherwise, that such articles may be so carried, and there is no plainly established usage negativing the right to claim such contribution." In O'Connor v. Neefus [unreported], in the district court for the Twelfth district of this state, it was held that where the usage in question exists a deck load lost by jettison must be contributed for. Judge Story, in his work on Bailments, seems to recognize the doctrine that in some cases, at least, goods stowed on deck may be contributed for. If, he observes, "they are so taken on board with the consent of the owner, or by a general custom binding him, he must bear the loss, unless, so far as he may be entitled to contribution, as in case of general average." Story, Bailm. § 530.

In this conflict of authority, a brief consideration of the objections to the doctrine contended for will not be inappropriate. The reason for excluding goods laden on deck from contribution, chiefly relied, is that assigned by Mr. Justice Weston, in Cram v. Aiken, viz. that such a mode of stowage increases the difficulty of navigation. But this can hardly be deemed a reason for a universal rule applicable to cases where the fact is otherwise, as it clearly may be, as said by Lord Denman in Milward v. Hibbert. But supposing it to be the case, and that there is some inconvenience attending this mode of transportation, yet, if these inconveniences are incidental to the particular navigation, and well known to be so,—if the usage to carry deck loads is common and notorious,—the case would not seem different in principle from that where the usage justified the stowage of flour with hogsheads of sugar, and the flour was injured in consequence. But the ship was held not to be re-

sponsible, for the shipper knew that his cargo would be stowed as every other cargo of the kind was stowed in a general ship in the particular trade. Baxter v. Leland [Case No. 1,125]. The shipper in this case sustained a loss, by reason of the presence of an article under deck, which injured his goods. But, inasmuch as the article was rightfully there according to usage, he had no ground of complaint. Is the case different if he sustains a loss by reason of the presence of a deck load, which is also rightfully and justifiably on board according to usage?

It is said in Lenox v. Mutual Ins. Co., that goods on deck are not considered part of the cargo, in which other shippers are interested; but if vessels in a particular trade notoriously and universally carry part of their cargo in this manner,—if they are constructed to carry deck loads, and not considered to be fully laden without them,—the goods so carried must be deemed as much a part of the cargo as the goods under deck. In Dodge v. Bartol, it is evidently supposed by the court that the exception in the French law, allowing contribution for deck loads in voyages "au petit cabotage," only applies to boats and small vessels going from one port to the next adjoining port, or for short distances along the coast. But we have seen that voyages to England, Scotland, Ireland and Holland, as well as in the Mediterranean, to Naples, Malaga, Sardinia and the Balearic Isles, are included within the term. If the exception be just as to such voyages, the voyage between this port and Cape Mendocino would seem to be within the reason of the exception. It is not intimated by Valin that deck loads in voyages "au petit cabotage" may not be somewhat more exposed than cargoes under deck, or that the navigation may not be slightly embarrassed in consequence. But they are allowed to be carried, and are contributed for on account of the notoriety of the usage, "which has been tolerated in consideration that otherwise freights would be higher." The principle laid down by Valin therefor, and established by the court of cassation, and in Gould v. Oliver [supra], contemplates a case where a stowage, otherwise improper, is justified by a notorious usage, which the convenience or necessities of a particular trade have given rise to. It would therefore be no answer, in such case, to say that the risk was somewhat increased, or the navigation, to a slight degree, impeded. If this were not the case, there would be no reason for the general rule, and no necessity for seeking a justification in the existence of the usage. Under this view it is unnecessary to examine particularly the evidence as to the effect of deck loads of lumber on vessels of the construction used in the trade. The testimony of the witnesses is conflicting on the point. All agree, however, that deck loads of lumber are invariably carried by vessels in the trade,

and this fact may be safely appealed to as showing that the obstruction to navigation cannot be very great, or the safety of the vessel seriously compromised by the practice. It is undoubtedly attended by some inconveniences, and there is, perhaps, more strain and wear and tear of parts of the vessel. But, for this, she is indemnified by the freight on the additional cargo, which frequently exceeds by one-fourth or one-third what she could carry under deck. Whether or not her safety is due to the facility with which she can get rid of her deck load, rather than to her general ability to carry it, may be more doubtful. Deck loads are certainly often jettisoned; but so are under-deck cargoes. Whether, if two vessels have each a full cargo, and one carries her cargo partly on deck and partly under deck, while that of the other is carried in the hold, the necessity for a jettison would sooner arise in the first than in the last case, is not very clear, from the evidence, but it would seem, from the refusal of the offices to insure deck loads except at a very high premium, that the risk was considered greater. It is to be remembered, however, that a jettison of a deck load, when necessary to lighten her, is far more easily effected than if the hatches had to be opened, and cargo taken from the hold during a tempest. But it appears to me, as already stated, that this inquiry does not affect the question of contribution, as presented in this case.

Another reason assigned for withholding contribution is that the law implies an assent on the part of the shipper not to claim it, or rather to assume the risk. But the inquiry is, does the law imply such an assent? It can hardly be argued that the law denies it, because he has consented to waive it, —and his consent to waive it is implied because the law denies it. In cases where goods are taken on deck by special agreement, and at a reduced freight, and where no usage exists justifying the master in carrying goods on deck without the consent of the shipper, it seems to me that his consent to assume the risk may reasonably be implied. In such cases the Consolato del Mare and the Marine Ordonnance deny him the right to contribution,—and the fact that his consent to such stowage is necessary to exonerate the master, seems to show that the goods are not properly on deck, and that there is no usage to carry them there, which would bind the underwriters or the other shippers. It is true that Mr. Phillips observes, in his opinion above cited, that "it does not appear what the rate of freight has to do with the question. The connecting the rate of freight in any way with the question of contribution seems, except in assessing the shipowner, to be entirely forced and fanciful." But, with deference to so great an authority on this branch of law, it is to be observed—1st, that we are now considering the question expressly in reference "to as-

sessing the shipowner"; and, 2dly, that in determining what are the risks assumed by the shipper, when he consents to a lading on deck, the inquiry whether he has received any equivalent for the risk said to be assumed appears rational,—and so it was considered in Smith v. Wright, 1 Caines, 43, and in Dodge v. Bartol, 5 Greenl. 286. Undoubtedly there are other risks, such as damage by sea perils, &c., which the shipper confessedly assumed, and which may be a reason for paying less freight. But still the risk of jettison is clearly the greater, if not the chief, risk with respect to lumber and all other goods not liable to damages by being wetted. And it is only such goods that are usually carried on deck. But in addition, if the existence of a special agreement for stowage on deck, and the payment of a lower freight in consequence, affects the right of contribution as against the ship, it must also affect the right as against co-shippers. For the exemption of the ship, if it be admitted, is on the ground that the shipper has assumed the risk,—and the shipper under deck, who knew that, though the ship might carry a deck load, yet it would be taken by special agreement, and at a reduced freight, and that the ship would not be liable to contribute, has a right to insist that the risk should be borne by the party assuming it. Moreover, if the shipper who, by special agreement, consents that his goods be carried on deck, and in consequence pays a lower rate of freight than the owner of similar goods carried under deck, is allowed a contribution, he is in a better situation than the latter,—for he incurs but the same or nearly the same risk if his goods are not liable to damage by wet, and he has them transported at perhaps half freight. The exception to the general rule, denying to deck goods the benefit of contribution, should, therefore, be restricted to cases falling within the principle of those decided in English and French jurisprudence.

Where the master has, by the notorious and established usage of a particular trade, the right to carry a part of his cargo on deck without obtaining the express consent of the shipper, it is but just that contribution should be allowed. If, as in voyages "au petit cabotage" in France, and in the case of steamboats with us, any of the goods of any shipper may, by usage, be so carried, they are as much part of the "cargo" when so stowed as if under deck. To make the loss by jettison fall solely upon him whose goods happen to be on deck, would be to fix the loss where accident or an improper discrimination on the part of the master, and not justice, causes it to fall. If the usage only authorizes the stowage of certain kinds of goods on deck, then, to make the other shippers liable, it should appear that such goods form a usual and customary part of the cargo of vessels in the trade,—so that the shipper under deck has a right to expect that they will be on board, and, if on board, will be so carried. On the other hand, if it appears that though the practice of carrying deck loads is general, and even invariable, in the trade, yet that they are so carried by a special agreement with the owner, and with his express consent, and at a lower rate of freight, the case seems to fall within the general rule of the Consolato, denying contribution to the owner of the goods who expressly consents to a stowage on deck. When that consent is necessary to be obtained, before the goods can be so stowed without making the ship responsible, and when it has been given, and a lower freight paid, it is but reasonable to construe it as an agreement on the part of the shipper to assume the risk, and shippers under deck, who have paid full freight, ought not to contribute. Such I understand to be the view taken by the learned judge of the Twelfth district court. In his opinion, he observes: "By the usage, no distinction is made in the price. The master has the right to stow the cargo on deck or below deck, as he pleases. Suppose the master fills the hold with his own lumber, and puts the shipper's lumber on deck, shall the latter take the whole risk of vessel and cargo? Suppose two shippers have an equal quantity of lumber on board, is the risk and right to contribution to depend upon the accidental circumstance that the master has stowed the lumber of one on deck, and of the other under deck?" In the case, as presented to that court, this reasoning seems conclusive. But, suppose that one of the two shippers has insisted, as the usage gives him a right to do, that his lumber be carried under deck, while the other has consented that his lumber be carried on deck, but at a reduced freight, it would seem unjust that the risk should be equal, merely because the vessels in the trade are accustomed to carry deck cargoes on such terms.

In the case at bar, it appears that the deck loads are generally, if not invariably, carried. But it is always with the express consent of the shipper, and where, as in this case, all the cargo belongs to one shipper, who consents that part be carried on deck, a uniform freight is charged on the whole,—but less than would be demanded if all had to be stowed under deck. No usage has been proved which authorizes the master to carry any part of the cargo on deck, without the consent of the shipper. It is also stated by several witnesses that the usage and general understanding is that the shipper, by consenting to this mode of stowage, assumes the whole risk, and that deck loads are not contributed for. But the usage which is supposed to establish that deck loads are not contributed for is not without exceptions, and it seems to me rather the general impression as to a rule of law than a usage which should alter that rule. It is, as Mr. Phillips says, "giving the doctrine the name of usage." But the general usage and understanding

with regard to the effect of the express consent given by the shipper that his goods be carried on deck ought not, I think, to be disregarded, especially when it is in conformity with the construction which, if the foregoing views be correct, the law gives to the agreement. If contribution be allowed for goods carried on deck by express agreement with the shipper, the practice would soon become common and ripen into a usage, or what would appear to be such to a court of justice. For the master would be exonerated from liability by the agreement with the shipper, and the latter would be secure of an indemnity by contribution, while at the same time he pays less freight. The salutary rule of the ancient sea laws would thus, in practice, be abrogated, and shippers under deck be subjected to an unjust burden. It seems, therefore, required by sound policy that contribution should be made only in those cases where the usage is of so positive and determinate a character as to allow the master to carry goods on deck without and independently of the express consent of the shipper. I think, therefore, though I affirm the general proposition so ably and zealously maintained by the advocate for the libellants, and consider that deck loads are not always to be denied contribution, yet that the present case does not fall within the exceptional class in which such contribution can be claimed.